I concur in part and dissent in part.
I find insufficient evidence for the order asserting jurisdiction on the ground that there was a serious risk that these five-year-old girls were at substantial risk of suffering serious physical harm or illness because F.G. (Father) "provided a chaotic home environment including regular and consistent confrontational behavior with the children's school and in the community, causing an inability to meet the special needs of his children." I also believe that the trial court abused its discretion when it ordered that Father undergo counseling for his racist and sexist remarks, an order which was an outgrowth of the "chaotic home environment" order.
The reversal of the finding and order would not mean an end to this dependency, given the other, unchallenged, jurisdictional order. However the finding and counseling order may well pose a substantial barrier to reunification of this family, to the detriment of parent and children.
Further, I believe that the juvenile court strayed beyond the United authority granted by the dependency law. In making its dispositional order, the juvenile court found that Father "wants to be left alone to raise his kids" but that he was "a difficult man" and that "we need to help him do that properly." That is not the mandate of the dependency law. Unless there is proof that the children are in the situation described in section 300, a parent has a right to be "left alone to raise his kids," whether or not the court believes that the methods are proper. *Page 172 
In my view, the "chaotic home environment" allegation makes no sense in the context of Welfare and Institutions Code section 300, subdivision (b), which permits dependency jurisdiction only when children are at substantial risk of serious physical harm. I do not see how, in logic, "completely chaotic and disordered" behavior outside the home constitutes a chaotic environment in the home, or, most importantly, how any of that puts a child at risk of serious physical harm. There is certainly no evidence the chaotic home environment (whatever that means) put the children at that kind of risk.
The dependency law does provide for jurisdiction over children who have suffered or are at risk of "suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian . . . ." (Welf. Inst. Code, § 300, subd. (c).) The children here did not exhibit those symptoms. Indeed, they seem to have suffered more from their removal from their home (in foster care, G.G. cried nonstop and A.G. "shut down" and would not talk or smile) than from the conditions at home. Needless to say, subdivision (b) cannot be used as a substitute for proof of the kind of serious emotional harm specified in the statute.
This majority opinion is replete with evidence of Father's failings, but it is evidence which does not support this finding. Allegations that Father physically abused the children on prior occasions, emotionally abused them by yelling at them and calling them names, was an abuser of alcohol, and that the home had a rodent infestation were not sustained, in large part because the Los Angeles Department of Children and Family Services's (DCFS) proof of those facts fell apart when H.H. testified that DCFS's reports of her statements on those subjects were entirely inaccurate.[1] Evidence concerning Father's alleged drinking, etc., can thus play no part in our analysis.
Nor can the prior referrals have any place in our analysis. All but two were unfounded and those two were inconclusive. Unless we are to adopt a smoke-fire view of the evidence, the fact of the prior referrals is not evidence of abuse or neglect. In fact, it is the opposite, because in each instance where DCFS investigated, DCFS found the children happy, healthy, and well cared for.[2] *Page 173 
Further, while the majority opinion quotes G.G.'s statement that she didn't like her daddy, and A.G.'s statement that "he's mean" (is there a child who has not said that about a parent?), the record also reflects that A.G. test fied that she loved her daddy and (after she was detained) wanted to go home, and that at school G.G. would cry for her daddy. Other facts in the record show how much Father cared about his children: he enrolled in a parenting class for children with special needs a few days after they were detained. G.G.'s teachers testified to many negative things about Father, but also testified that he was so concerned about G.G. that he called her teacher often, perhaps once a week. In the weeks prior to the incident which led to the girls' detention, he was "very nice" and "very cordial" on the phone.
The juvenile court found that Father was "difficult everywhere." Can that be so? He had a close friend, H.H. He had enough success at his professions (a hairdresser, and later a plumber) so that he owned a home in Santa Monica. He and his daughters regularly visited his aged mother in her care facility. His tenant of five years, who lived on the premises, and observed the family, wrote glowingly of the way he cared for his children, and testified in the same manner.
It is apparent that dependency jurisdiction was asserted on this ground because of Father's argumentative and confrontational attitude, and his racist and sexist comments to social workers and others. Like the majority, I find his comments deplorable, but there is no evidence that Father's bad temper or deplorable remarks created a risk of serious physical harm to these children. Nor do I see anything in the dependency law which says that parents and children can be separated because a parent has deplorable beliefs — and it is easy to see the great harm which would ensue if it did.
It is obvious, then, that I do not believe that the dependency court could order Father into counseling to address his racist and sexist remarks. The juvenile court has broad discretion to fashion a dispositional order in accord with this discretion (In re Alexis E. (2009) 171 Cal.App.4th 438, 454
[90 Cal.Rptr.3d 44]), but the discretion is not unlimited. "The program in which a parent or guardian is required to participate shall be designed to eliminate *Page 174 
those conditions that led to the court's finding that the child is a person described by Section 300." (Welf. Inst. Code, § 362, subd. (c).) I would reverse the "chaotic home environment" finding which is the only jurisdictional finding which can be construed to refer to Father's racist and sexist remarks. In my view, such statements cannot be the basis for assertion of dependency jurisdiction, no matter whom they are made to. Thus, a parent may not be ordered to go into counseling concerning such statements, as part of a reunification plan.
[1] pause here to note that while it is possible that DCFS and H.H. had some innocent failure of communication, the fact that her statements were repeatedly misreported, to Father's detriment (a mouse in the house became a rodent infestation, a few drinks on weekends became alcohol abuse, her concern about the children's welfare in foster care became concern about their welfare at home) suggests otherwise.
[2] For instance, after an August 2007 referral, DCFS interviewed the children and their school. The school reported that the children appeared healthy and well cared for, and DCFS found no sign of abuse or neglect. In September 2008, after a Trader Joe store manager and customers complained that Father had abused G.G. by twisting her ear, a police officer lound G.G. "happy and healthy," and learned from Father and G.G. that he had grabbed G.G.'s ear after she ran off, but had not twisted it. In 2005, the girls' daycare provider, who saw them every weekday, reported no concerns about Father. I add that the allegation that Father put a cigarette in G.G.'s ear, cited as fact by the majority, was one of the referrals that DCFS investigated and determined was unfounded. *Page 175